**In re EASTERN MAINE ELECTRIC COOPERATIVE, INC., Debtor.**

**Bankruptcy No. 87–20290.**

United States Bankruptcy Court,
D. Maine.

Dec. 3, 1990.

William C. Black, Public Advocate, Joanne B. Steneck, Maine Public Utilities Com'n, Augusta, Me., Louis H. Kornreich, Cross, Minsky, Mogul & Singal, Bangor, Me., John M. Grugan, Ferriter, Scobbo, Sikora, Caruso & Rodophele, Boston, Mass., Gary L. Blum, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, Mark Haley, Conley, Haley & O'Neil, Bath, Me., Peter B. McGlynn, Rosen, Crosson, McGlynn & Resnek, Boston, Mass., George W. Kurr, Jr., Logan, Kurr & Hamilton, Bangor, Me.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

This opinion and order addresses a number of issues presently pending. Before discussing them specifically, a brief resume of the case will provide useful context.

### A. Background.

This Chapter 11 case has been pending for over three years.[1] The Debtor, Eastern Maine Electric Cooperative, Inc., (EMEC), is a rural electric cooperative[2] serving an area encompassing portions of Aroostook, Penobscot and Washington counties in Eastern Maine.

The Debtor's invocation of Chapter 11 in 1987 was motivated primarily by its desire to mitigate the financial obligations it incurred as a party to the Project No. 6 Power Sales Agreement (PSA), a joint-ownership purchase of potential power to be generated by Public Service Company of New Hampshire's Seabrook Nuclear Power Project ("Seabrook"). Under the PSA, which was promoted by Massachusetts Municipal Wholesale Electric Company,[3]

---

1. The voluntary petition for relief was filed on August 31, 1987.

2. In Maine, rural electric cooperatives are organized pursuant to 35–A M.R.S.A. § 3701, *et seq.* Such cooperatives are included as one of several "Consumer Owned Utilities," a category which also includes, *e.g.* utilities owned or partially owned by municipalities or quasi-municipal entities. 35–A M.R.S.A. § 3501. Such entities are subject to special provisions regarding rate-making, 35–A M.R.S.A. § 3502, that enable them to change rates without in every case undergoing the extensive investigation and hearings processes that investor-owned utilities must. *See* 35–A M.R.S.A. § 301.

 The cooperative is governed by its members, who elect a board of directors at annual meetings. 35–A M.R.S.A. §§ 3735, 3737. By and large, the cooperative's customers are its members. Although some customers are not members, one must use electric power supplied by the cooperative to become, and to remain, a member. 35–A M.R.S.A. § 3734. *See also* EMEC By-laws, *Article I, Section 1.*

3. As originally established in 1969, MMWEC was to be the power planning organization of the electric systems of certain Massachusetts municipalities. It has subsequently become an organization empowered to buy and sell electricity, enter into power supply contracts and to provide other services for participating municipalities.

 MMWEC is a public corporation and a political subdivision of the Commonwealth of Massachusetts created pursuant to Chapter 775 of the Acts of 1975. The exercise of its powers is "deemed and held to be the performance of an essential public function." M.G.L.A. c. 164 App., § 1–2. Essentially, MMWEC is a vehicle through which small electric utility systems can aggregate their resources in order to enjoy the economic benefits associated with centralized electric facilities.

 MMWEC's rights and powers are set forth in M.G.L.A. c. 164 § 1–5. They include the power to purchase electric power and energy, to sell electric power and energy to member and non-member cities and towns with municipal electric departments, to contract with respect to the purchase, sale, delivery, exchange, interchange, wheeling, pooling, transmission or use of electric power and energy and to otherwise participate in intrastate, interstate and international arrangements with respect thereto. M.G.L.A. c. 164 App., § 1–5(1), (m), and (o). MMWEC is also empowered to acquire, construct, improve, purchase, operate, maintain, use, share costs of, own, lease, sell, dispose of or otherwise participate in electric power facilities in which the corporation acquires or owns an interest as a tenant-in-common with others. M.G.L.A. c. 164 App., § 1–5(p).

 MMWEC acquires its electricity resources through direct ownership interests in generating units ("Power Supply System") and through contracts for the purchase of shares of output of other generating units ("Power Purchase Arrangements".)

 In order to finance purchases of electricity, MMWEC is authorized to borrow money

EMEC and twenty-seven other electric utilities in New England purchased approximately six percent of the Seabrook "capability." [4]

### 1. *The MMWEC Dispute.*

In the years preceding the filing, EMEC encountered growing opposition to rate increases from, and faced challenges to management by, its members. Experiencing substantial financial strain by virtue of its obligations under the PSA, becoming less and less sure that Seabrook would ever generate power, and certain that its PSA obligations would increase,[5] EMEC

ceased making its payments to MMWEC under the PSA in 1987 and filed its Chapter 11 petition.[6]

Proceedings to date have been contentious. The Debtor sought to reject the PSA as an executory contract.[7] On October 25, 1988, the court held that the PSA was a financing vehicle, rather than an executory contract.[8] Rejection of the PSA was therefore unnecessary.

MMWEC thereafter filed a claim for what was asserted to be owing on account of EMEC's default. MMWEC had initially filed a proof of claim for $24,706,347.00,[9]

---

[through] bond issues. M.G.L.A. c. 164 App., § 1–9. MMWEC may issue only such amount of bonds as the Massachusetts Department of Public Utilities, after notice and hearing, may vote is reasonably necessary for the proposed purpose. Such approval shall be subject to such reasonable terms and conditions as the Department of Public Utilities may determine to be in the public interest. M.G.L.A. c. 164 App., § 1–17.

**4.** Between 1976 and 1979, MMWEC acquired from Public Service Company of New Hampshire an approximate 11.59% interest in Seabrook under four separate projects. A portion of MMWEC's 11.59% interest in Seabrook is Project Number 6, which is a 6.0001% interest in the nuclear power facility. MMWEC packaged Project Number 6 by executing separate Power Sales Agreements with 28 municipal electric utilities and cooperatives, including EMEC, throughout Massachusetts, Rhode Island, Vermont and Maine. Under the Power Sales Agreement, MMWEC sells, and the individual utilities and cooperatives buy, a share of Project Number 6 capability. "Capability" is defined in the agreement as the "amount of electric capacity and energy, if any, which the project is capable of producing at any particular time." In exchange for its share of "capability", the utility or cooperative agrees to fix and revise its fees and rates to meet its obligations under the Power Sales Agreement, and agrees to make monthly payments to MMWEC for its share of costs associated with MMWEC's investment in Seabrook. The Power Sales Agreements executed by the individual utilities and cooperatives, in turn, provided security for the financing bonds issued by MMWEC.

The PSA provides its signatories with a share of six percent of Seabrook's energy output. However, because the project was not "on line" when the PSA was signed, because MMWEC issued bonds to finance the share of Seabrook construction and start-up costs attributable to that six percent, because money was being spent on the project and because it was uncertain

whether all, some or any of Seabrook would ultimately produce power, the PSA has been termed a "hell or high water" contract. Project participants signed on to pay their share of costs associated with six percent of Seabrook's capability, whether or not the project was completed and whether or not power was ever generated by the reactors there.

Because the Participants comprise a significant block of interest in this case, an Official Project 6 Participants' Committee was formed by The Assistant United States Trustee on February 9, 1988. The Participants assert that each has substantial claims against EMEC and, further, contend that if EMEC pays less than it full PSA obligation, they will have to make up the difference.

**5.** In its disclosure statement, EMEC represents that its payments under the PSA were $96,000.00 per month in 1987. As Participants were called upon in the future to pay increasing amounts under the PSA, EMEC projected that it would be forced to raise its utility rates approximately thirty percent, an increase deemed unacceptably high by EMEC's board.

**6.** EMEC claims that it sought to reduce the burden of the PSA in a number of ways, including refinancing its portion of the PSA obligation at a rate lower than it faced in carrying its share at the rates on MMWEC's borrowing, prior to the filing. In addition, it attempted to sell or transfer its interest in Project 6 to third parties in return for an assumption of EMEC's future PSA obligations. There were no takers.

**7.** 11 U.S.C. § 365; Bankruptcy Rule 6006. Pursuant to a joint motion of MMWEC and EMEC, the Court ordered, on December 7, 1987, that rules governing adversary proceedings would apply to the contract rejection motion.

**8.** Order of October 25, 1989 (Court Document No. 200).

**9.** Claim No. 2, filed December 14, 1987.

but subsequently amended it upward in light of the October 25, 1988 order.[10]

On January 24, 1989, MMWEC initiated an adversary action to liquidate all of its claims against EMEC. The court scheduled a trial for early 1990. On January 23, 1990, a proposed compromise allowing MMWEC's claim and dismissing the adversary action was read into the record. That compromise called for allowing the MMWEC claim in the amount of $30,000,-000.00 as a general unsecured claim, and for limiting MMWEC's recovery from the estate to $15,000,000.00.[11] An application to compromise was filed on February 1, 1990, followed by the filing of objections by the majority of the Participants[12] and by the Official Project Six Participants' Committee.[13] Later, MMWEC itself objected to the compromise.[14]

On May 11, 1990, the court ruled that the parties were bound by their representations of compromise as read into the record on January 23 and as modified on the record on February 20, 1990. MMWEC has appealed,[15] as has the Official Project Six Participants' Committee.[16]

### 2. *Competing Plans.*

Presently before the court are three separate proposed plans of reorganization. The competing plans have been put forward by MMWEC, by the Project Six Participants' Committee and by the Debtor. Each of the plans is based upon a different asserted value of the Debtor's enterprise and upon a different proposed treatment of claims, including the class of general unsecured creditors and the class or classes of the cooperative's members.

MMWEC's plan of reorganization contemplates a sale of Debtor's assets and business, including its operating authority, to an MMWEC organized investor-owned utility formed under Maine law. It is premised on a projected liquidation value of $29,000,000.00, as of June 1, 1990. Both the Project Number 6 Participants' Committee Plan and the Debtor's Plan provide for a continuation of the Cooperative by the Debtor. The Participants' Committee plan is based on a purported going concern value of $28,570,668.00, as of June 30, 1990, whereas the Debtor has estimated its going concern value at $13,270,668.00, as of December 31, 1989.

All three plans provide that residential rate payers who were required to pay residential deposits prior to the date of filing will either receive or retain the value of such deposits. MMWEC and the Debtor propose that commercial deposits paid prior to filing will be either returned or retained in accordance with the terms under which the deposit was paid.

Both the Participants' Committee plan and the Debtor's plan provide that the Debtor will continue to pay the secured claims of the Rural Electrification Administration (REA)[17] and the National Rural

---

10. Claim No. 39, filed November 1, 1988. The amended proof of claim increased the amount demanded by MMWEC substantially and included claims for compensatory and punitive damages based on EMEC's alleged bad faith in, among other things, refusing to raise rates to generate revenues sufficient to pay its PSA obligations. The revised claim is for an unliquidated amount, but has been estimated by EMEC to be for as much as $300,000,000.00.

11. Transcript of proceedings held January 23, 1990.

12. Court Documents No. 312–322, 335.

13. Court Document No. 316.

14. Court Document No. 341, filed February 28, 1990.

15. MMWEC Notice of Appeal, Court Document No. 366, filed May 18, 1990.

16. Participants' Committee Notice of Appeal, Court Document No. 368, filed May 21, 1990. The Committee has appealed notwithstanding the fact that the order approving the compromise reserved any ruling on the question whether Participants had individual claims against the Debtor, over and above the claim of MMWEC, whether those claims would survive the compromise, or what the amount of those claims might be.

17. The REA is EMEC's largest creditor, holding a claim of approximately $11,000,000.00, secured by virtually all of EMEC's assets. The REA is an entity created by federal statute, 7 U.S.C. § 901, *et seq.*, for the purpose, *inter alia,* of providing lowcost financing to rural, customer-owned utilities.

Utilities Cooperative Finance Corporation (CFC) [18] in accordance with the pre-filing loan documentation and shall reaffirm its duties and obligations pursuant to the documentation. MMWEC's plan provides that the purchaser will assume and perform Debtor's duties and obligations pursuant to the pre-filing loan documentation, and will continue to pay the REA and CFC claims in accordance with the documentation.

Each plan proposes a different treatment of unsecured creditors. MMWEC's plan proposes to pay unsecured claims in full. However, it also provides that an unsecured creditor, at its option, may irrevocably waive its cash distribution and in lieu of the cash, permit 80% of its allowed claim to be paid over 28 years at 10% annual interest. The remaining 20% of the allowed claim of the electing creditor would then be satisfied by the purchaser issuing one share of its voting common stock for each one hundred dollars of debt.

The Participants' Committee plan categorizes unsecured claims into four categories, including an administrative convenience class of small claimants (Class 3); moderate-size claims ($200.00 to $20,-000.000) (Class 4); liquidated claims in excess of $20,000.00 (MMWEC) (Class 5); and unliquidated claims over $20,000.00 (Participants' separate claims) (Class 6). While proposing to pay Classes 3 and 4 at or within sixty days of confirmation, the Committee would pay Classes 5 and 6 over time.

EMEC's plan also has multiple classes of unsecured claims, including a class of small claims ($200.00 or less); general unsecured claims; and classes for its members in respect to membership fees, patronage capital, and membership rights. The general unsecured creditors will be paid over 30 years, pro-rata, deferred payments with a present value of $7,293,271.15 with interest at 10%.

Each Plan of Reorganization also contemplates different treatment of patronage capital credits. MMWEC's Plan will pay rate payers for credits earned prior to August 31, 1987. The credits will be paid in cash, unless set off. The rate payer may exercise an option to offset the credit against future bills for electric services provided by the utility. The Participants' Committee proposes rate payers will not receive any payment or distribution on account of their capital credits. The Debtor's plan, however, provides that members and non-members with patronage capital credits earned prior to the commencement of the case, will be paid, pro-rata, the total sum of $200,281.07 within one year of the effective date of the Plan.

Regarding the members' $5.00 membership fee, MMWEC's Plan proposes payment in cash. The Participants' Committee's plan contemplates no payment. The Debtor's plan provides that such claims are to be satisfied, pro-rata, by payment of $6,447.78 within one year of the effective date of the plan.

Debtor's plan recognizes EMEC's members' interests in management and control. It provides that they will not receive or retain any property under the Plan on account of those interests.

### 3. *Pending Issues.*

It is in this context and with this history in mind that the court's attention turns to the following matters:

a. Motion for reconsideration of order granting Maine Public Utility Commission's (MPUC) motion for a special exception to be heard in hearings considering the adequacy of disclosures relative to and confirmation of the three competing plans;

b. Motions for reconsideration of order granting Maine Public Advocate's (PA) motion for a special exception to be heard in hearings considering disclosures and confirmation; and

c. PA's application for an order appointing a committee of members. [19]

---

**18.** The CFC is also a creature of federal law and provides loans supplementary and complementary to those of the REA. *See* 7 U.S.C. § 936. CFC's claim of approximately $650,000.00 is secured by junior liens on virtually all of EMEC's assets.

**19.** Oral orders disposing of each of these matters were announced in open court on October

## B. *Discussion.*

### 1. *Requests for Reconsideration.*

On September 21, 1990, this court entered orders permitting special exceptions for the MPUC and the PA to be heard in connection with disclosure statements and confirmation. The Participants' Committee and MMWEC seek reconsideration of the order.

Any reconsideration of the September 21, 1990 order must begin with a review of this court's order of October 16, 1987. Judge Goodman there denied motions by the PA and the MPUC seeking party-in-interest status under 11 U.S.C. § 1109(b), but, with limitations, granted their motions to intervene under Bankruptcy Rule 2018(a). That order established that the PA and MPUC are not parties-in-interest, that they have no right to appeal orders of this court and, further, provided that their costs, fees or expenses attributable to participation in the case will not be considered expenses of administration. The order established that the PA's and MPUC's rights of intervention were limited:

> to general, non-adversary proceedings relating to the general operation of the business of the debtor as well as to proceedings relating to confirmation of the plan of arrangement, this last condition subject to special exception upon application by the intervenor to be heard in connection with any particular proceeding.

On September 14, 1990, the MPUC applied for a special exception seeking to be heard in connection with hearings considering the three filed plans of reorganization and their accompanying disclosure statements. The PA filed a similar motion on September 19, 1990.

On September 21, 1990, considering the substance of the October 16, 1987 order and the fast-approaching hearings for consideration of disclosure statements, this court concluded that convening a hearing to consider the motions for special exception was not necessary,[20] and granted the PA's and MPUC's requests to be heard. That order provided:

> There are presently before the court three suggested plans of reorganization (with accompanying disclosure statements) proposed by three separate parties. Each plan relies on operational revenues for funding and the rates charged by the debtor to its electric utility customers are the primary source of those revenues. Each plan further contemplates that the debtor's rates will change, to greater or lesser degrees, over the life of the plan and, further, each plan acknowledges the role of the MPUC in rate regulation.

The order addressing the request to be heard by the PA further stated:

> The PA is charged with the statutory duty of representing the debtor's customers in connection with, among other things, rate setting proceedings. The impact of rate changes on the debtor's customers is or may be a significant factor in the approval and implementation of rate changes and, therefore, the PA's position can contribute to the court's consideration of the matters before it.

The PA's and the MPUC's rights to be heard concerning the adequacy of disclosure statements and the confirmation of a plan, remain subject to the terms and conditions of intervention set forth on October 16, 1987. The more recent ruling provides that the scope of MPUC and PA participation in hearings would remain subject to restriction and limitation through objection raised by parties attending the hearings and by the court's orders relating to the expeditious and orderly conduct of those hearings.

MMWEC and the Project Six Committee have raised a number of arguments in sup-

---

16, 1990. Summary written orders were entered. This opinion supplements and, with regard to some analysis, alters the rationale underlying the previously entered orders. The announced disposition of the issues is unchanged.

20. *See* Maine Bankruptcy Rule 9013(f)(1). Hearings shall not be required on motions, except (i) motions for relief from stay, not assented to, (ii) motions for lien avoidance under Bankruptcy Code § 522(f), and (iii) motions expressly required by rule or statute to be heard.

port of their request that the orders of September 21, 1990 be reconsidered and amended or rescinded altogether. MMWEC argues that the MPUC should only be heard in connection with those rate issues over which it has jurisdiction because there is "no authority" under the Bankruptcy Code or the Bankruptcy Rules for a broader role for that agency. With regard to the PA, MMWEC claims that permitting the PA to be heard at all is wrongheaded, that its participation in hearings on disclosure statements and confirmation will be duplicative and will only cause undue confusion and delay.

The Project Six Committee joins in those arguments and, in addition, by supplemental memorandum argues that recently-promulgated federal regulations of the Rural Electrification Administration (REA),[21] which purport to preempt state rate-making authorities in connection with REA borrowers that are subjects of bankruptcy proceedings, nullifies any argument that the PA should be heard. The Project Six Committee's argument assumes that the preemptive effect of those regulations will eliminate the MPUC's role in this Debtor's reorganization altogether. The Project Six Committee argues that, with the displacement of the MPUC functions by the REA, "the question remains whether the PA can or should step into the shoes of the MPUC" for the purposes of being heard in these proceedings. The argument characterizes any role that the PA may play as duplicative of those to be played by other parties-in-interest. More particularly, the Project Six Committee argues that EMEC "already represents" the interests of its members in that EMEC, through its proposed plan of reorganization, is doing all it can to avoid a base rate increase. On the assumption that concern with rates is the exclusive worry of electric utility customers, the Project Six Committee argues that, given EMEC's recalcitrance on the point, nothing more is to be added by the PA.

### a. The MPUC.

■ The movants seek an express limitation on the role of the MPUC in connection with disclosure statements and confirmation proceedings establishing, at the outset, that the MPUC may be heard only with regard to rate issues since the "only role" Congress envisioned for a state public utilities commission in a case such as this is that of passing upon proposed utility rates, either in advance of confirmation or subsequent thereto. They cite *In re Public Service Co. of New Hampshire*, 108 B.R. 854, 891 (Bankr.D.N.H.1989) and Code § 1129(a)(6) as authority for the proposition that any broader role of a state regulatory authority such as the MPUC in the bankruptcy process has been preempted and foreclosed by the Bankruptcy Code.

The *Public Service Co. of New Hampshire* opinion, however, presents a reasoned decision rendered at the culmination of an adversary proceeding initiated by an investor-owned, regulated, monopoly electric utility in bankruptcy seeking a declaration of respective rights and obligations of the debtor and state officials regarding the scope of regulatory approvals required for confirmation and implementation of a plan of reorganization. This court is loathe summarily to determine the preemption issues in the guise of a ruling limiting, in advance of hearing, the scope of the MPUC's participation in disclosure and confirmation hearings. To date, no such declaration of respective substantive rights, responsibilities and authority has been sought by any party in this case. Moreover, prior to ruling on the preemption issues in the declaratory judgment context, the *Public Service Co. of New Hampshire* court had permitted the State of New Hampshire to intervene under Bankruptcy Rule 2018(a) on account of its regulatory authority (as of then unchallenged) over the debtor's affairs. It had also permitted intervention by the New Hampshire Office of the Consumer Advocate to present the position of residential electric customers and by the Business and Industry Association of New Hampshire to represent the interests of business users of electricity supplied by the Debtor. *In re Public Ser-*

21. 7 C.F.R. Ch. XVII, §§ 1717.350–356 (1990).

vice Co. of New Hampshire, 88 B.R. 546, 555–557 (Bankr.D.N.H.1988). In the course of considering the requests for intervention before him, Judge Yacos observed that wisdom often dictates that defining the opportunity for, and scope of, participation by intervenors be considered in specific contexts, rather than at the threshold. *Id.* at 554–555.

Because there has yet to be an occasion for a decision defining the vitality and scope of the MPUC's jurisdiction in the context of EMEC's reorganization, and because MPUC has state law regulatory authority over electric utilities, including EMEC,[22] it is appropriate that the MPUC be permitted to be heard in hearings to consider disclosure statements and proposed plans of reorganization.

Although the Project Six Committee's reliance on newly-enacted federal regulations purporting to preempt state rate-making jurisdiction to the Rural Electrification Administration for electric utilities in bankruptcy, effective October 19, 1990, is made to support its opposition to the PA's intervention, that argument proceeds on the assumption that the MPUC's only role in the case will be taken from it on the effective date of those regulations. It further assumes that the federal authority's attempt to preempt state rate-makers by regulation enacted pursuant to 7 U.S.C. §§ 901–950b, a statute that has been on the books, in one form or another, since 1936 and which has previously been administered without invoking preemption over state rate-makers,

is valid in the face of any challenges which might be made. Those issues, too, have yet to be decided.

For the reasons set forth above, the motion seeking reconsideration of this court's order permitting intervention of the MPUC in confirmation and disclosure hearings, subject to conditions set forth in the October 16, 1987 order and in the additional qualifications in the September 21, 1990 order itself, is denied.[23]

### b. The Public Advocate.

■ Citing 35–A M.R.S.A. § 1702, the Participants' Committee urges that the PA's statutory authority is so limited in matters involving consumer-owned electric utilities as to preclude intervention here. The argument fails on two fronts.

First, the issue of the PA's ability to be heard in this matter was decided on October 16, 1987.[24] That the PA has now sought the special exception to be heard that was expressly contemplated by that order does not open the door to a challenge to the PA's very right to appear. Second, as a matter of statutory interpretation, the Committee's argument is wanting. Contrary to the Committee's assertions, 35–A M.R.S.A. § 1702(7), which directs the PA to "assist customers of consumer-owned electric utilities" in connection with rate-making proceedings and, in certain instances, to intervene before the MPUC on a customer's request, does not limit the PA's authority with regard to customer-owned electric utilities, including cooperatives.[25] The ex-

22. *See* 35–A M.R.S.A. § 101, *et seq.*

23. Following the oral rulings of October 16, 1990, the MPUC filed a letter dated October 19, 1990, from Mr. Gary C. Byrne, Administrator of the REA, relinquishing that agency's claimed preemptive regulatory authority over EMEC's rates and authorizing MPUC's "immediate resumption" of jurisdiction over those rates.

24. *See* discussion *supra*. The wisdom of the limited intervention permitted the PA is confirmed in the discussion of issues raised by Consumers Union's intervention attempts in the Eastern Airlines case, *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 851 (Bankr.S.D.N.Y.1989), as well as by *In re Public Service Co. of New Hampshire, supra.*

25. The full text of 35–A M.R.S.A. § 1702 provides:

 **§ 1702. Duties.**
 The duties and responsibilities of the Public Advocate are to represent the using and consuming public in matters within the jurisdiction of the commission, including, *but not limited,* to the following:
 *1. Review and recommendations.* The Public Advocate may review, investigate and make appropriate recommendations to the commission with respect to:
 A. The reasonableness of rates charged or proposed to be charged by any public utility;
 B. The reasonableness and adequacy of the service furnished or proposed to be furnished by any public utility;

press direction of 35–A M.R.S.A. § 1702(7) does not deny the PA the ability to take any of the other statutorily enumerated actions on behalf of consumers customer-owned electric utilities, including seeking to intervene in "proceedings before ... federal agencies and courts...." [26]

The essence of the remaining objections to permitting the PA to be heard is that, in light of the stance taken by the EMEC against seeking a base-rate increase, the rate payers of the Debtor are already adequately represented. Thus, it is argued that any role by the PA will be duplicative and will result in unnecessary and unreasonable delay in the reorganization process.

The fallacies of argument are several. First, the PA has, by statute, a role to play in representing consumers of electrical power and is authorized to intervene in the state or federal courts. MMWEC and the Project Six Committee assume that the sole concern of electric power consumers is rates, although the PA might well address additional issues of consumer interest relating to the reorganized utility's potential for growth and for maintaining reliable and dependable service. Such issues touch upon future revenues and future needs for capital expenditures, items with substantial impact on the prospects for a successful reorganization. In addition, as noted above, the role of the PA in disclosure and confirmation hearings remains subject to the original conditions set forth in October 1987 and, further, the qualifications of the September 21, 1990 order. To say that the right to be heard in any given hearing equates with the right to be heard for as long as one chooses and about any topic one chooses is unwarranted. The court is confident that, with the constructive assistance of counsel, duplication, confusion and delay can be eliminated in the more specific, and more appropriate context, of the hearings themselves.

Moreover, although the author is new to the case, having reviewed the record in considerable detail, the court is convinced that the delay experienced to date, which has not been insubstantial, far outshadows any marginal delay that may accrue as a

C. Any proposal by a public utility to reduce or abandon service to the public;

D. The issuance of certificates of public convenience and necessity. Recommendations may include alternative analyses and plans as necessary;

E. Terms and conditions of public utilities;

F. Mergers and consolidations of public utilities;

G. Contracts of public utilities with affiliates or subsidiaries; and

H. Securities, regulations and transactions of public utilities.

*2. Intervention.* The Public Advocate may intervene in any proceeding before the commission related to the activities under subsection 1, when determined necessary by the Public Advocate.

*3. Petition to initiate proceedings.* The Public Advocate may petition the commission to initiate proceedings to review, investigate and take appropriate action with respect to the rates or service of any public utility when determined necessary by the Public Advocate.

*4. Public complaints.* The Public Advocate may investigate complaints affecting the using and consuming public generally, or particular groups, of consumers and, where appropriate, make recommendations to the commission with respect to these complaints.

*5. Intervention on behalf of public.* When determined necessary by the Public Advocate, in the interest of the using and consuming public, or any particular group of consumers, the Public Advocate may intervene and appear on their behalf in any proceedings before the commission, appeals from orders of the commission, or proceedings before state and federal agencies and courts in which the subject matter of the action affects the customers of any utility doing business in this State, except that the Public Advocate shall not intervene in any proceeding in which the commission staff is representing a position substantially similar to that of the Public Advocate, as determined by the Public Advocate.

*6. Annual Report.* The Public Advocate shall prepare and submit an annual report of activities of the Public Advocate to the Governor and to the joint standing committee of the Legislature having jurisdiction over public utilities by August 1st of each year, with copies available to all legislators on request.

*7. Assist customers of consumer owned electric utilities.* The Public Advocate shall assist customers of consumer-owned electric utilities in reviewing proposed rate increases and preparing questions and testimony for public hearings and, on request of a customer and when determined necessary by the Public Advocate, intervene in the proceedings conducted in accordance with chapter 35.
(Emphasis added.)

**26.** 35–A M.R.S.A. § 1702(5), *supra* n. 25.

consequence of permitting the PA to be heard as the voice of the consuming public.

### 2. *Application for Appointment of a Committee of Members.*

In addition to seeking special exception to be heard under the order of October 16, 1987, the PA has filed an application seeking an order appointing a committee of members of EMEC to participate in the case pursuant to Code § 1102(a)(2). The parties have submitted a copy of EMEC's by-laws, as well as a copy of a letter directed to the membership by the management of EMEC, dated September 14, 1990.

In the course of oral argument, counsel for the Debtor represented that EMEC had written to the membership urging formation of a members' committee because, among other things, all of the plans of reorganization on file would have an impact on members' rights.[27] Indeed, the second amended plan of reorganization submitted by the Debtor itself provided that members would be paid nothing in respect of accumulated patronage capital credits, would receive nothing in respect of their right to a refund of their $5.00 membership fees upon what was characterized as "termination" of their membership through the plan, and, further, that they would neither receive nor retain anything in respect of their membership rights to participate in management. Thus, counsel argued that EMEC was not advocating a position consistent with the interests of its membership in all respects and, therefore, that, without a members' committee, the members would

be left wanting for representation in the case.

The PA's application for formation of a members' committee, which is opposed by the Project Six Participants' Committee, the separately-represented sixteen Project Six participants and by MMWEC, raises the following issues:

1. Through the Public Advocate's application, has the request for formation of a members' committee been properly raised?

2. Are members of EMEC, a rural electric cooperative organized pursuant to state law, "equity security holders" or "creditors" of EMEC within the meaning of the Code so as to qualify for creation of an "additional committee" on their behalf under Code § 1102(a)(2)?

3. Assuming that an additional committee could be appointed to represent the Cooperative's members, should the court, on the facts of this case, exercise its discretion to do so?

### a. *Is the Issue Properly Before the Court?*

■ The objecting parties have objected to the very consideration of the PA's application for establishment of a members' committee because, among other things, the PA, who is not a party-in-interest in these proceedings[28] has been the one to initiate the application.

The PA has been granted a limited right to intervene in these proceedings. The PA is most certainly entitled to be heard. The PA's application, which has not been challenged from any quarters as having been

---

**27.** The September 14, 1990 letter from EMEC to its membership, MMWEC Exhibit 1, stated, in pertinent part:

The Bankruptcy Code allows for the formation of a members' committee to represent the interests of members in the Bankruptcy court. We believe the members should be represented by an independent committee so that their opinions will be considered by the Judge. In order to form a committee, a request must be sent to the Judge in the form of a motion. This motion may be filed by any member or group of members wishing to form a committee. (It may also be filed by the Cooperative or any other party in the bankruptcy proceeding.)

You may wish to file such a motion for the creation of a committee or ask the Cooperative to file such a motion on your behalf. You may also wish to contact the office of the Public Advocate in Augusta and ask him to request the appointment of a members' committee. If the Judge grants the request, he will instruct the U.S. Trustee to appoint seven members to a committee. The committee may then ask the Public Advocate to represent its interests before the court.

**28.** *See* this order of October 16, 1987, and text *supra* at p. 922 and following.

initiated without cause or as containing representations that are not based upon the PA's investigation and understanding, represents that certain, named members of EMEC requested the PA to seek formation of a members' committee. Thus, although perhaps ineptly titled,[29] the application seeking formation of a members' committee is an application initiated by the members' themselves, through the agency of the PA.[30] No one contends that the members are not parties-in-interest. Therefore, the application is properly before the court for decision.[31]

### b. Does the Code Permit Appointment of a Members' Committee?

The Code directs the United States trustee to appoint an unsecured creditors' committee, and permits appointment of other committees of creditors or equity security holders "as soon as practicable" after entry of the order for relief under Chapter 11.[32] Code § 1102(a)(2) provides that, if necessary to assure their adequate representation in the case, the bankruptcy court may order the appointment of additional committees of "creditors or of equity security

holders." Unless the interests of the cooperative's membership can be characterized as those of creditors or of equity security holders, § 1102(a)(2) grants no authority to establish a committee.[33] Those who oppose the application contend that the cooperative's members are neither creditors nor equity security and, being neither fish nor fowl, a committee to represent their interests cannot be formed.

EMEC's members do not appear to hold equity security as that term is commonly understood. The cooperative's by-laws catalogue a number of characteristics of membership. The status, rights and obligations of members sometimes do, and sometimes do not, coincide with attributes normally associated with holders of garden variety equity security. Members do not purchase shares in the open market, but they do pay a $5.00 membership fee.[34] The fee is returnable to them upon termination of their membership.[35] They are entitled to vote on matters of internal governance, principally election of directors.[36] Members do not hold ownership interests directly in the assets of the cooperative.[37] Members do enjoy limited liability.[38] Memberships are not

---

29. As filed with the court, the request for the appointment of the committee was titled "Application of Public Advocate for Order Appointing Committee of Members." Court Document No. 439.

30. The application listed the names of 16 members requesting that a committee be formed and that they be included on it. The membership is not far-flung, and the nature and extent of members' claims is far from speculative. Cf. In re: Ionosphere Clubs, Inc., supra, 101 B.R. at 852 (addressing agency issues in context of motion seeking to intervene on behalf of consumers).

31. The application does, however, go beyond merely seeking formation of a members' committee. The PA seeks to "represent" the committee through his counsel in these proceedings. The PA's request that he be the committee's representative is bound up in the application, but not inextricably so. Given the decision on the ultimate issue of whether a committee is to be formed, the question whether the PA could or could not represent or participate on the committee need not be addressed.

32. Code § 1102(a)(1).

33. See In re Finley, Kumble, Wagner, Heine, et al, 85 B.R. 13 (Bankr.S.D.N.Y.1988). The par-

ties have not raised the issue whether the court could order appointment of a committee representing some other group or groups through the exercise of its general equity powers. In light of the disposition of the issue here, the Court will not address the question whether Code § 105 permits the appointment of a committee through exercise of general equity power in circumstances other than those provided for in Code § 1102(a).

34. By-laws of EMEC. Article I, Section 4 (membership fee shall be $5.00) and Article I, Section 6(c) (in case of withdrawal or termination of membership, the Cooperative will repay to the member the amount of the membership fee less the amount of any debts or obligations owed by the member to Cooperative.)

35. Id.

36. By-laws of EMEC, Article VI, Section 2.

37. By-laws of EMEC, Article II, Section 1 (property interests of members). By-laws of EMEC, Article II, Section 2 (non-liability for debts of the Cooperative).

38. By-laws of EMEC, Article II, Section 2 (members are not liable for cooperative's debts).

transferable in the ordinary sense.[39] Members do not receive interest or dividends based upon capital they "furnish" as "patrons."[40] Members do earn patronage capital credits based on the cooperative's revenues in excess of expenses and the member's consumption of power from the cooperative.[41] Members do have an interest in the surplus value of the cooperative's assets after satisfaction of certain obligations, including claims of creditors.[42] Given these characteristics of membership, can members be "equity security holders" for purposes of Code § 1102(a)(2)?

The Code defines "equity security holder" as one who holds an equity security of the debtor.[43] "Equity security", in turn, is defined in Code § 101(15) to mean:

(A) Share in a corporation, whether or not transferable or denominated "stock", or similar security;

(B) Interest of a limited partner in a limited partnership; or

(C) Warrant or right, other than a right to convert, to purchase, sell or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph....

Certainly, some parts of the definition can be ruled out as irrelevant to the question at hand. Members do not hold shares in a corporation under any reasonable construction of that term.[44] Neither do they hold limited partnership interests or warrants or rights to purchase, sell or subscribe to corporate shares or limited partnership interests. The inquiry must focus on whether or not membership in the cooperative is a "similar security" as that term is used in Code § 101(15)(A).

In challenging the members' status as putative equity security holders, the opposing parties point to the definition of "security" that has evolved defining the scope and application of the securities acts.[45] Although that definition has been found wanting by some commentators,[46] the body of law developed by the courts in that context is substantial. That law, which interprets and applies the statutory definitions of the securities acts, presents a ready and appealing reference for analyzing whether holders of a given interest are or are not "equity securities holders" under the Bankruptcy Code. Although cases have addressed the answer, they are few and, more importantly, inapposite to the issue at hand.[47]

**39.** By-laws of EMEC, Article I, Section 1 (no membership in the Cooperative shall be transferrable, except as provided in the By-laws); Article I, Section 3 (conversion from individual to joint membership with spouse).

**40.** By-laws of EMEC, Article VII, Section 2.

**41.** Under the by-laws, such credits are generally credited to members' capital accounts as though they were cash capital investments. By-laws of EMEC, Article VII, Section 3. The patronage capital credited to a member's account does have value to the member, e.g. on liquidation of the cooperative, on death of the members, and, at the directors' discretion, upon a decision to "retire" the credits by payment or in kind credits. *Id. See infra* n. 61.

**42.** By-laws of Eastern Maine Electric Cooperative, Inc., Article II, Section 1 (upon dissolution of the Cooperative, after all debts and liabilities of the Cooperative shall have been paid, and all patronage capital credits retired, the remaining property and assets of the Cooperative shall be distributed among the members and former members in the same proportion as their patronage bears to the total patronage of all members during the 10 years proceeding the date of the filing of the certificate of dissolution.)

**43.** Code § 101(16).

**44.** As noted above, the debtor is organized as a cooperative under 35–A M.R.S.A. § 3701, *et seq.,* rather than as a business corporation. *Cf.* 13–A M.R.S.A. § 101 *et seq.*

**45.** *See* definitions at 15 U.S.C. § 77b (Securities Act of 1933) and 15 U.S.C. § 78c(11) (Securities Exchange Act of 1934). The two definitions are somewhat different on their face, but have been treated as "nearly identical" in decisions dealing with definitional scope. 2 L. Loss & J. Seligman, *Securities Regulation* at 870 (3d Ed.1989).

**46.** *E.g.,* H.S. Bloomenthal, *Securities and Federal Corporate Law* § 2.02 (1988) (inability of the courts to define a "security" is one of the "notable intellectual failures of American corporate law") (quoting Carney & Fraser, *"Defining a 'Security': Georgia's Struggle With the 'Risk Capital' Test,"* 30 Emory L.J. 73 (1981).

**47.** *See e.g., In re Finley, Kumble, Wagner, Heine, et al, supra; In re Westgate General Partnership,* 55 B.R. 560 (Bankr.E.D.Pa.1985). Both cases addressed eligibility of general partners as "equity security holders" and held that they were not, so that an "additional committee" under

The context of definitional development is all-important. Under the securities laws, the definition of "security" has evolved against a background in which threshold disclosure to potential investors and ongoing protection of investors to maintain the integrity of the trading markets are paramount.[48] The "investor protection" orientation of the securities laws has shaped the contours of the definition of security under them. The focus is upon information and practices that have material impact on investment and trading decisions. In *United Housing Foundation, Inc., v. Forman*,[49] the Supreme Court held that membership in a housing cooperative did not constitute an investment contract[50] within the definition of a security for purposes of the registration requirements of the Securities Act of 1933.[51] In *Forman*, persons wishing to occupy apartments in subsidized housing in Co-op City, a New York Housing cooperative, were required to purchase stock in Riverbay Corporation. The amount of stock purchased depended on the size of the apartment sought. The Supreme Court concluded that the stock purchase was, in essence, a "recoverable deposit" on the apartment.[52] The shares were not transferable in the usual sense, could not be hypothecated, and carried with them no pro-rata voting rights in the corporation's affairs.[53] The stockholder had no ability to sell the stock at an appreciated price or to share in "profits" of Riverbay.[54] Parties

opposing the PA's efforts seeking appointment of a committee of members urge the court to apply *Forman* uncritically. Although parallels to *Forman* can be drawn, differences exist not only in the nature of EMEC's members' rights, but also in the statutory and factual terrain in which those members find themselves today.

The cooperative's members do hold interests that differ in significant respects from traditional equity interests. EMEC is a monopoly supplier of electric power to consumers within its territorial area. Its organization, and the members' place in it, create a far different relationship than that which results from an investor's volitional act of choosing among a variety of investment opportunities and selecting one enterprise in which to put money at risk. The objective in acquiring membership in the cooperative is, rather, to obtain electric service. The other attributes and benefits of membership, including the ability to vote for management and, ultimately to realize benefits from excess revenues less expenses, might be characterized as merely consequential. Under the securities law definition of equity security, the members might well not be considered to be equity security holders.

Understandably, given its incubation in a statutory and regulatory atmosphere fostering investor protection, one might presume that the definition of security under

---

Code § 1102(a)(2) would not be formed. The definition in Code § 101(15) inferentially excludes general partners by silence while expressly including limited partnership interests. *In re Westgate General Partnership, supra.* Moreover, the interests of general partners of a debtor partnership will generally be at odds with one another as a consequence of their joint liability or joint and several liabilities to partnership creditors. *See In re Finley, Kumble, Wagner, Heine, et al., supra* and Uniform Partnership Act, enacted at 31 M.R.S.A. § 295.

**48.** *See e.g., S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946) (construing "investment contract" under § 2(1) of the Securities Act in a manner to "afford the investing public a full measure of protection").

**49.** 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

**50.** The securities acts' definitions include a recital of specific arrangements that constitute securities. In addition, they include "investment contracts" within the definition. That term has provided the vehicle by which the courts have extended the definition to encompass arrangements the regulation of which is seen to further congressional objectives of investor protection. *See, e.g.,* Note, *Discretionary Commodity Accounts as Securities: An Application of the Howey Test,* 53 Fordham L.Rev. 639, 643–44 (1984).

**51.** *Id.* at 851, 95 S.Ct. at 2060.

**52.** *Id.,* 421 U.S. at 842, 95 S.Ct. at 2055.

**53.** *Id.* Voting rights were allocated per living unit, not per share. *Id.*

**54.** *Id.,* 421 U.S. at 842–43, 95 S.Ct. at 2055–56.

the securities acts would, because of its liberality, prescribe the outer boundaries of "equity security" as Congress intended when it devised the "similar security" language of Code § 101(15)(A). In searching out and articulating definitions embodied in the Bankruptcy Code, however, one must examine the entire statute and the legislative aims which the definitions are meant to serve.[55]

Under the securities laws, the paramount objectives are to provide broad investor protection through disclosure and deterrence of fraud.[56] Thus, public offering and market trading of securities have been federally regulated in order to ensure that those who choose to put their money at risk in enterprises that operate essentially beyond their day-to-day control have as much information as reasonably necessary to make informed decisions about their investment and trading choices. On the other hand, the reorganization process,[57] including the disclosure and solicitation procedures it employs is intended to provide procedural safeguards and information to parties having a "stake" in an enterprise that is undergoing reorganization.[58] Thus, while the disclosure requirements of the securities acts seek to protect interests and expectations of those who may *choose* to become involved in an enterprise, or who *choose* to participate in the trading markets, the Bankruptcy Code's provisions were enacted to protect and to give voice to the interests of parties with interests in an enterprise undergoing reorganization. Thus, notwithstanding the broad definition of "security" under the securities acts, the limits of the term as heretofore defined may well be inadequate to the task set by the Bankruptcy Code.[59]

EMEC's members most certainly have a "stake" in the enterprise. Pertinent state statutes and the cooperative's by-laws give the members rights to a voice in management, to a potential return of their membership fees, to accumulated patronage capital credits based on the cooperative's operational results, and, on dissolution, to a share of the surplus value of its assets, if any. Not coincidentally, they are also consumers of the entity's product. Although the objecting parties would have us focus exclusively on their status as customers, and reject formation of an § 1102 committee out of hand, it is clear that the members have other substantial interests that are at stake in this reorganization. As noted above, each of the three pending plans would alter those interests.[60] It would be anomalous if, based upon a crabbed interpretation of the Code's terms, the court ruled out formation of a commit-

---

**55.** *See In re Swanson,* 873 F.2d 1121, 1124 (8th Cir.1989) ("When interpreting statutes we favor an interpretation that is consistent with the entire statutory scheme under review and one that will not undermine complementary portions of the same statutory scheme.")

**56.** *See e.g. Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). The Securities Act of 1933 was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing. Citing H.R.Rep. No. 85, 73d Cong. 1st Sess., 1–5 (1933).

**57.** *See* Code §§ 1109(b) (party-in-interest has right to be heard), 1121 (who may file a plan), 1125 (disclosure and solicitation), and 1129 (confirmation standards).

**58.** 11 U.S.C. § 1125 addresses the process of post-petition disclosure and solicitation of votes

for proposed plans of reorganization. Section 1125(b) provides that acceptance or rejection of a plan may not be solicited unless at or before solicitation there is also transmitted a written disclosure statement approved by the court as containing adequate information. Section 1125(a)(1), in turn, defines "adequate information" as information of a kind, and in sufficient detail, that would enable a hypothetical reasonable investor to make an informed judgment about the plan.

**59.** Significantly, with the definitions set forth in the 1933 and the 1934 Acts commence the phrase "unless the context otherwise requires...." *See* 15 U.S.C. § 77a et seq. (Securities Act of 1933) and 15 U.S.C. § 78a et seq. (Securities Act of 1934). Thus, the statute itself (regarding exclusion), as well as the case law (regarding inclusion) emphasizes the importance of context to the exercise of applying the definition in each case.

**60.** *See* text *supra* pages 920–922.

tee that could represent the cooperative's thousands of members, all of whom are acknowledged parties-in-interest in the case.

The potential formation of a committee also raises the issue whether members of the cooperative are also its creditors. Reference to Code § 101(9) and § 101(4) demonstrate that the members likely are creditors for purposes of Code § 1102(a)(2), as well.

Article I, Section 4 of the Cooperative's by-laws provide that a membership fee of $5.00 must be paid. Article I, Section 6 provides that if members withdraw from membership, are expelled by a vote of the board, or have their membership cancelled on account of disuse of the utility's power, or otherwise terminated "in any manner", the Cooperative will "repay" to the member the amount of the membership fee paid by him. That right to repayment is subject to offset for amounts owed by the member to the Cooperative.

Article VII, Section 3 provides members with certain rights regarding what has been termed as "patronage capital". Each year, the Cooperative is required to credit the capital account of each member with the member's pro rata share of revenues in excess of operating costs and expenses. However, the by-laws also provide that, upon posting of the patronage capital credits to the capital account of the member, the member's claim for those credits is satisfied, just as though the member had been paid in cash in consideration of those credits, and, further, as though the patron had then furnished the Cooperative a corresponding amount for capital.[61] In other words, once the patronage capital account of a member is credited, the member ceases to have a "claim" for payment or credit of the amounts so earned. Until then, however, a claim, perhaps contingent and unmatured, would appear to exist.

Finally, in the event of dissolution or liquidation of the Cooperative, the by-laws provide that outstanding capital credits of members will be retired on a pro rata basis after payment of all outstanding indebtedness of the Cooperative; and that the board may, prior to dissolution, retire patronage capital credits of members if doing so would not impair the financial condition of the cooperative.[62] If the Cooperative dissolves or is liquidated, the members are only entitled to their pro rata share of the excess assets of the Cooperative on the basis of their ten year historical patronage, after payment of all outstanding indebtedness of the corporation and after retirement of all patronage capital credits.[63] Given the Code's broad definition of "claim" and "creditor", §§ 101(4) and 101(9), the Cooperative's members would qualify for formation of a § 1102(a)(2) committee.[64]

---

**61.** The by-laws of Eastern Maine Electric Cooperative, Inc., Article VII, Section 3 *Patronage Capital in Connection With Furnishing Electric Energy* provides in pertinent part:

> In order to induce patronage and to assure that the Cooperative will operate on a non-profit basis the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy in excess of operating costs and expenses properly chargeable against the furnishing of electric energy. All such amounts in excess of operating costs and expenses at the moment of receipt by the Cooperative are received with the understanding that they are furnished by the patrons as capital. The Cooperative is obligated to pay by credits to a capital account for each patron all such amounts in excess of operating costs and expenses. The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron, and the Cooperative shall within a reasonable time after the close of the fiscal year notify each patron of the amount of capital so credited to his account. All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts for capital.

**62.** By-laws of EMEC, Article VII, Section 3.

**63.** By-laws of EMEC, Article II, Section 1.

**64.** The status of EMEC's members as security holders and creditors is before the court only with regard to threshold criteria for formation

It appears that, in the reorganization context, members in a rural electric cooperative such as EMEC likely hold interests sufficiently similar to the interests of shareholders in a corporation that they would qualify as "equity security holders" for purposes of Code § 1102(a)(2). Moreover, at least with regard to some aspects of membership, they would appear to be creditors, as well. Thus, were the time right to form a members' committee, this court would not simply adopt and apply definitions spawned in other waters to exclude the possibility.

The more difficult issue, however, is whether the court should exercise its discretion to order appointment of such a committee at this time.

### c. Should a Committee of Members be Constituted at This Time?

■ The essential question is whether or not the interests of the members are "adequately represented" at this stage of the proceeding. Whether or not an additional committee is to be formed is a matter committed to this court's discretion. *In re McLean Industries, Inc.*, 70 B.R. 852 (Bankr.S.D.N.Y.1987).

> Noteworthy is the absence of any indication from the statutory language that the Court's ability to determine the issue of adequate representation is fettered by any constraint other than the requirement that the appointment of one or more additional committees is necessary to achieve the designed goal.

*Id.* at 856. In passing on the question whether members presently are adequately represented, one must inquire into the purposes of the "representation" that they are entitled to expect. The answer is a function of the role that an official committee is meant to play in a bankruptcy reorganization.

■ Among the purposes and functions of a committee are:

1. Investigation of the debtor, its business assets, liabilities and financial affairs and assessment of the desirability of the debtor's continuing in business. *In re McLean Industries, Inc.*, *supra* at 860; *In re Kaiser Steel Corp.*, 74 B.R. 885, 890 (Bankr.D.Colo.1987);

2. Participation in negotiating a plan of reorganization given the high desirability of obtaining a consensual plan, *In re McLean Industries, Inc.*, *supra* at 860, *In re Kaiser Steel Corp.*, *supra* at 890;

3. "Assistance" of the bankruptcy court by playing a role in the "settlement process" and by participating in the reorganization process, *In re J.E. Jennings, Inc.*, 96 B.R. 500, 503 (Bankr.E.D.Pa.1989); *In re Global International Airways Corp.*, 45 B.R. 258 (Bankr.W.D.Mo.1984);

4. Participation in and initiation of various proceedings, representing the view of its constituent body, including such proceedings as proposed sales out of the ordinary course of business and proposed post-petition financing arrangements, *In re McLean Industries, Inc.*, *supra* at 860; and

5. Monitoring the business affairs of the debtor on an ongoing basis and meeting periodically to discuss case progress and the debtor's operations, *In re Oliver's Stores, Inc.*, 79 B.R. 588, 597 (Bankr.D.N.J. 1987).

In this case, we are already over three years into the reorganization process. Post-petition financing stipulations have been considered,[65] attempts at negotiating consensual plans have been made (without success), three competing plans of reorganization have been proposed,[66] and the parties are in the midst of hearings on the last two disclosure statements, having already considered the first.

The PA has sought to intervene on behalf of EMEC's customers, and has been granted special exception to be heard in

---

of an additional committee under Code § 1102(a)(2). Other issues pertaining to the members' status, *e.g.* classification of their claims and interests for treatment under reorganization plans, have yet to be determined.

**65.** *E.g.,* Order Authorizing Use of Cash Collateral, dated September 21, 1987, Court Document No. 48.

**66.** *See* text *supra* pages 920–922.

connection with disclosure and confirmation issues.[67] To the extent that there is an identity of interests between customers and members, they therefore have a voice in these proceedings.[68] The Debtor has advocated confirmation of a plan that does not require a substantial increase in the rates it charges customers for electrical power. Thus, although less than perfect, there has been and will continue to be conduits to the bankruptcy court for the Debtor's members' concerns.

■ Importantly, the role of an official committee should be one that, with the administrative oversight of the United States Trustee, provides representation of an appropriate constituent body of parties-in-interest for the benefit of the reorganization process as it proceeds within the mechanisms of the bankruptcy court. In that regard, the role of the committee should include gathering information from its constituency and channelling that information through the committee and its professional agents so that the concerns and contributions of that constituency can be articulated by a representative entity. That representative entity can and should, on the basis of its authority, participate in the bankruptcy process, including negotiation of a plan of reorganization and recommending its acceptance or rejection. The existence of a committee enables other parties in the reorganization to deal with an entity that it can reasonably rely upon as expressing the concerns of the group it represents. Of course, the committee can, and should, also provide information to its constituency regarding significant developments in the case on a regular basis.

The time for meaningful participation by a committee of members has long passed. Indeed, the PA's application makes it clear that the purpose of the proposed committee is less to participate in the reorganization and negotiation process than it is to provide a source of information to the membership regarding the plans and disclosure statements that are already on file. In that respect, the operation of the committee would be far more limited than should be the case for an official committee.

Formation of an official committee of members is therefore not justified and will not now be ordered. EMEC's members are free, however, to establish an informal committee that can assess the impact of the various plans on the membership, make recommendations and take other steps that will serve the purpose of informing its constituents.[69] Moreover, the Cooperative's members have available to them the resources of the PA who has been granted the ability to speak on behalf of EMEC's consumers.

Finally, in exercising discretion not to appoint a committee, the court notes that the membership body has been essentially quiet for three years. The opportunity for the formation of a committee that would have a significant, constructive role in assisting other parties in formulating an acceptable plan of reorganization or exploring alternative avenues has passed this case by.

## C. *Conclusion.*

For the reasons set forth above, the motions to reconsider permissive intervention by the PA and the MPUC are denied, and the PA's application seeking formation of a committee of members is denied, as well.

---

**67.** See text *supra* at n. 20 and following.

**68.** *Id.*

**69.** *See In re Finley, Kumble, Wagner, Heine, et al, supra,* where general partners of partnership debtor sought appointment of general partners'

committee to assist in asset collection and reorganization. The court denied the request but stated "nothing in the Bankruptcy Code precludes the partners of the Debtor from creating an unofficial committee or committees." *Id.,* 85 B.R. at 18.